UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-19-CR-832-1 |
| | § | |
| GERALD M. GOINES | § | |

# UNITED STATES' MOTION FOR REVOCATION OF RELEASE ORDER

At the conclusion of a detention hearing on November 22, 2019, the United States, consistent with the recommendation of the United States Pretrial Services for the Southern District of Texas, asked Magistrate Judge Dena H. Palermo to detain the defendant pending trial. On November 26, 2019, Judge Palermo entered an order releasing the defendant.

The United States respectfully requests that this Honorable Court conduct a *de novo* review of Judge Palermo's release order, and after such review, revoke that order and order the defendant detained pending trial. The United States believes that the severity of the federal charges and the defendant's conduct in committing them indicates that he is both a flight risk and a danger to the community, and that the interests of justice can only be served in this case by revoking the magistrate judge's release order and detaining him pending trial.

## I. FACTUAL BACKGROUND OF CASE

### A. Lies That Led to the Deaths of Two Houstonians & Injuries to Several Officers

We are here because on January 28, 2019, the defendant, a 34-year veteran of the Houston Police Department (HPD), lied to a Houston municipal judge when he swore out an affidavit for a "no-knock" search warrant claiming he had probable cause to search a residence located at 7815

Harding Street in Houston, Texas. *See* Exhibit 1, the Harding Street Search Warrant Affidavit. In that affidavit, the defendant swore to the judge that a confidential informant (CI) bought heroin from a male at the residence at 7815 Harding Street one day before, on January 27, 2019. This claim he made to the judge was a lie. The defendant also swore to the judge that he searched the CI prior to the CI conducting the buy, observed the CI go into the home, and saw the CI leave the home with items of a brown powdery substance that the CI said was called "boy," a slang term for heroin. All of those statements to the judge were lies. The defendant also claimed that the CI saw that the male in the home possessed a 9 millimeter caliber handgun during the buy, and that there were large amounts of small baggies of the brown substance in the home. All of those statements to the judge were also lies. The defendant also asserted that HPD officer Steven Bryant, his former partner and now co-defendant, recognized the brown substance by "sight and texture" as heroin. That statement to the judge was also false.

Relying upon the defendant's false claims about the residents of 7815 Harding Street dealing heroin and possessing a 9 millimeter firearm, the municipal judge, who had sworn the defendant to his affidavit and had no reason at that time to question the facts the defendant swore to, granted the "no knock" warrant for the residence at 7815 Harding Street. The judge granted this warrant at 1:37 p.m. on January 28, 2019. *See* Exhibit 2, the Harding Street Warrant. After he obtained the search warrant, the defendant then completed a "tactical plan" for how to execute the search warrant later that day, and an HPD offense report. Both of these documents contained lies that the defendant had put into the search warrant affidavit, and are the basis for Count 3 and Count 4 of the Indictment.

A few hours later, at approximately 5:00 p.m. on January 28, 2019, about 20 HPD officers,

including the defendant, executed the no-knock search warrant for the residence at 7815 Harding Street. Within seconds of officers breaching the front door of 7815 Harding Street, the residents, Dennis Tuttle and Rhogena Nicholas, and their dog, had been shot dead, three officers were shot, including the defendant, another officer was hit by shrapnel, and a fifth officer suffered a severe knee injury. Although HPD officers found firearms in the home, and a small amount of cocaine and marijuana, consistent with personal use, they did not find any heroin, evidence consistent with dealing heroin or other drugs, or a 9 millimeter caliber handgun.

**B. More Lies in the Post-Raid Investigation**

In the wake of the search warrant execution of the residence at 7815 Harding Street, HPD conducted an investigation and sought to interview the CI the defendant claimed in his search warrant affidavit had purchased heroin from the residence the day before the raid. On January 30, 2019, the defendant told HPD officers the name of a CI (CI #1) he claimed made the Harding Street buy. That claim was another lie and is the subject of Count 5 of the Indictment. That same day, HPD investigators interviewed CI #1, who denied making a drug purchase from 7815 Harding Street.

On January 31, 2019, the defendant told an HPD lieutenant a different CI, CI #2, had made the Harding Street buy. This statement was also a lie, since HPD interviewed CI #2 that same day and CI #2 also denied making the Harding Street buy. That false statement is the subject of Count 6 of the Indictment. Over the next several days, HPD investigators interviewed all other CI's assigned to the defendant under HPD's records – each of them also denied making any drug purchases at 7815 Harding Street.

On February 13, 2019, the defendant asked to speak to HPD investigators and did so later

that day. He then told them, in the presence of his attorney, that he had purchased the heroin from the residence at 7815 Harding Street on January 27, 2019, not a CI. *See* Exhibit 3, February 13, 2019 Written Statements. Using a variety of investigative techniques, including reviewing cell site location records for the defendant's cell phones, HPD investigators determined that the defendant did not make the alleged buy at 7815 Harding Street as he now claimed because he had been nowhere near that location on that date. The defendant's claim was yet another lie and is the subject of Count 7 of the Indictment.

During his February 13, 2019, statement, the defendant also admitted that officer Steven Bryant never did observe "the narcotic was purchase[d] from the residence." Investigators also showed the defendant a picture of two baggies of heroin that had been found in his city-issued unmarked police vehicle, the defendant falsely claimed that was what he purchased from 7815 Harding Street on January 27, 2019. Subsequent to the February 13, 2019, interview, investigators showed CI #2 the same picture of the baggies and she identified them as the ones her friend bought from a drug dealer at a location on Napoleon Street in Houston on or about January 21, 2019, about a week before the Harding Street raid, and which had been subsequently given to the defendant. That fact led investigators to review any investigation the defendant had into that Napoleon Street address, which led to them discovering more false statements the defendant made regarding CIs and purported drug buys, as described in more detail below.

### C. Other Goines Search Warrant Related Lies

HPD's investigation, which included reviewing cell site records and interviewing CI #2 and her friend, revealed that on January 21, 2019, CI #2's friend made a purchase of two baggies of heroin from an address on Napoleon Street and provided the drugs to CI #2. At the time, the

defendant was not in the area, and did not witness the purchase. As a result, CI #2 buried the drugs nearby, and later retrieved the heroin and took the packets home.

Just before midnight on January 22, 2019, a different municipal judge signed a “no-knock” search warrant for Napoleon Street. In the affidavit, the defendant falsely claimed that on January 22, 2019, a CI bought crack cocaine (not heroin) from the Napoleon Street address. He also claimed, like he did with Harding Street, to have searched the CI before the buy, observed the CI go into the house, and then watched the CI come out from the house with the drugs. All of those statements, like similar statements he made in the Harding Street warrant, were lies. Soon after the municipal judge signed the search warrant for the Napoleon Street address, the defendant visited CI #2 at her home on January 23, 2019, at just after midnight, and retrieved the heroin her friend bought from Napoleon Street on January 21, 2019. The defendant did not tag or submit this heroin into evidence and/or for testing by HPD. Instead, he simply kept it until it was found in his city vehicle on January 30, 2019. CI #2 and her friend recognized the picture of the baggies of heroin found in the defendant’s car, and later shown to the defendant on February 13, 2019, as the heroin that was bought from Napoleon Street.

Over the next two days, narcotic officers were prepared to execute the search warrant on Napoleon Street, but due to a delay out of the defendant’s control, they were unable to execute that arrant and the defendant abandoned executing it on January 24, 2019, four days before he obtained and executed the search warrant for 7815 Harding Street.

Since the discovery of the lies contained in the defendant’s affidavit for the search warrant for the Napoleon Street address, investigators have discovered several other search warrants where it appears that the defendant has lied about CIs and controlled drug buys in the affidavits he swore

out to obtain those warrants.

### D. Goines's Violation of HPD Narcotics Practices

HPD and FBI have conducted investigations into the defendant since the January 28, 2019, Harding Street raid, which showed that when the defendant met with and/or interviewed his CIs, he often did so alone, and would also direct them to make controlled buys of drugs at those times. The FBI's investigation, which included interviews with several members of HPD, showed that meeting with a CI alone and without a witness is a violation of HPD's practices. Meeting alone, among other things, raises safety concerns. But Goines did more than simply meet alone with a CI, he had a sexual relationship with one of his CIs, a CI he falsely once claimed made the Harding Street buy, CI #2. CI #2 admitted while working as a CI for Goines she has maintained a sexual relationship with him over several years. In addition to her statements, there is home surveillance footage showing Goines visiting CI #2 at her home a little after midnight on January 23, 2019, when he retrieved the heroin purchased from Napoleon Street, and then a little after midnight on January 26, 2019, when she claimed they engaged in sexual conduct. The January 23, 2019, meeting only appears to have lasted for a few minutes, while the January 26, 2019, meeting was approximately an hour – these timeframes are consistent with what CI #2 stated occurred during these visits. Maintaining a sexual relationship with a CI is a major violation of HPD policies, and demonstrates the defendant's willingness to flout rules and take advantage of opportunities unique to a police officer for his own benefit.

### E. Search of Defendant's City-Issued Vehicle

After the Harding Street raid HPD investigators searched the defendant's city-issued vehicle and found, in addition to the two baggies of heroin detailed above, several other loose drugs,

including crack cocaine, ecstasy, and marijuana, as well as a stolen firearm. None of these items had been tagged or otherwise logged into evidence for HPD - HPD had no way of knowing these items were contained in the defendant's city vehicle.

## II. INDICTMENT, PRETRIAL REPORT, AND DETENTION HEARING

### A. The Indictment

On January 8, 2019, Patricia Ann Garcia, a neighbor of Tuttle and Nicholas who lied several times when she made 911 calls to HPD alleging that her daughter was in 7815 Harding Street doing heroin and crack with Tuttle and Nicholas, that Tuttle and Nicholas had a machine gun, and were armed drug dealers, and that she wanted police to go into 7815 Harding Street and get her daughter out. None of that was true, and police came to the scene that night and saw nothing but a quiet home without any apparent lights on or activity occurring inside.

Even though the responding officers were unable to corroborate Garcia's claims of criminal activity occurring at 7815 Harding Street on January 8, 2019, they passed her claims along to the Narcotics Division the same night, and they were eventually given as a lead to the defendant on January 11, 2019. HPD's investigation shows the defendant appears to have conducted no follow-up investigation related to allegations of criminal activity 7815 Harding Street between the time he received the lead and when he took the search warrant package to the municipal judge on January 28, 2019 - a search warrant the judge said he only found probable cause for and signed based on the defendant's lies about the facts in his affidavit.

On November 14, 2019, a federal grand jury in Houston returned a nine-count indictment against the defendant, Bryant, and Garcia. Seven of the nine counts are against the defendant. The first two counts allege the defendant violated the civil rights of Tuttle and Nicholas, and that

these crimes resulted in their deaths. Those two counts each have a maximum sentence of life in prison without parole. The other five counts allege the defendant obstructed justice by making a variety of false statements, including the statements he made to HPD about who bought the heroin during the post-raid investigation. Each of the obstruction counts carry a maximum sentence of up to 20 years in prison.

### B. The Pretrial Report

Agents arrested Goines on the Indictment on November 20, 2019, and he made his initial appearance in court that same day. At the initial appearance, United States Pretrial Services for the Southern District of Texas issued a report (the "Pretrial Report"). The Pretrial Report listed the defendant's employment status and sources of income as stated by him. According to the defendant, who retired from HPD in March 2019, his sole source of income since retirement has been an HPD pension. He claimed he has been unemployed since he retired from HPD. In addition, his wife later corroborated that purported fact with Pretrial Services. Neither one of them mentioned a job with the Lanier family in Houston that pays the defendant approximately $800 a week, a fact that only came to light at the detention hearing. The defendant has apparently been working for the Lanier family in various capacities for years.

The defendant's wife also claimed to Pretrial Services that the defendant is in charge of paying all bills, that their home is under his name, not hers, and that she does not own any property in the event she is asked to co-sign a bond. The Pretrial Report also mentioned that the defendant owned eight or nine firearms, but Goines claimed the firearms have been removed from the home.

The Pretrial Report then recommended that Goines be detained pending trial citing risk of non-appearance based on the offenses charged, the lack of verifiable employment for Goines, and

pending felony murder charges in Texas State Court relating to the Harding Street raid. In addition, the Pretrial Report also alleged that Goines is a danger to the community because of the "nature of the instant offense," "safety concern for the community or specific individual," and Goines's "history of weapons use" as a "prior police officer."

### C. The Detention Hearing & Release Order

At the initial appearance, the United States moved for detention and a detention hearing was scheduled for Friday, November 22, 2019. At this detention hearing the Magistrate Court heard testimony from FBI Special Agent Oneil Brown for the United States, and from witnesses for the defendant, including members of the Lanier family and a representative of a bond company that has underwritten defendant's state court bond as it relates to complaint filed against him by the Harris County District Attorney's Office for felony murder. At the conclusion of the detention hearing, the United States argued that Goines was both a risk of flight and a danger to the community. Judge Palermo took the matter of detention under advisement. *See* Ex. 4, the Detention Hearing Transcript.

On November 26, 2019, Magistrate Judge Christina A. Bryan, the Magistrate Judge then on duty in Houston, read into the record Judge Palermo's decision to release the defendant (the "Release Order") on certain conditions, including the following: (1) a $150,000 unsecured bond co-signed by his wife and daughter, (2) 24-hour home confinement with certain exceptions, (3) GPS monitoring, (4) no employment as a security guard or in law enforcement, (5) provide all phone for inspection and phone numbers to pretrial services, (6) prohibition on selling his home, (7) no contact, directly or indirectly, with witness, victims, co-defendants, or CIs, and (8) his wife must serve as a third-party custodian obligated with informing Pretrial Services if the defendant

does not comply with his bond conditions.

At the hearing, the United States filed an oral motion to stay the Release Order so we could have time to file a motion to revoke the Release Order under 18 U.S.C. § 3145(a)(1) with this Court, and for this Court to review and rule on the motion. Judge Bryan granted the motion to stay over the defense's objection. In requesting the stay, the United States also told Judge Bryan we would file the motion to revoke the Release Order by November 27, 2019. Judge Bryan asked that in the meantime the United States file a written motion to memorialize the request for the granted stay, which we did on November 26, 2019.

## III. ARGUMENT FOR REVOCATION AND DETENTION

The United States request that this Court perform a *de novo* review of the Release Order. The district court reviews a release order *de novo*. *See United States v. Rueben*, 974 F.2d 580, 585-86 (5th Cir. 1992) ("[T]he district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release"); *United States v. Delker*, 757 F.2d 1390, 1394-95 (5th Cir. 1985). The "simple preponderance standard" governs the flight risk determination, that is, a detention order should issue if "the judicial officer should determine that it is more likely than not that no condition or combination of conditions will reasonably assure the accused's appearance." *United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985) (distinguishing this standard governing the flight risk determination with the higher "clear and convincing" burden of proof that governs detention based on danger to the community).

While the bond conditions set by the Release Order have restrictions on the defendant's movements and activities, after a *de novo* review of the Release Order, this Court should determine that there is no condition or combination of conditions that will reasonably ensure that the

defendant will appear at future court appearances and not present a danger to the community. As discussed below, a preponderance of the evidence shows that the defendant is a flight risk and clear and convincing evidence shows that he is a danger to the community. Accordingly, pursuant to 18 U.S.C. § 3145(a)(1), the Release Order should be revoked and the Court should detain the defendant pending trial.

### A. Goines is a Flight Risk

Based upon the factors regarding detention set forth under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that would eliminate his risk of flight and reasonably ensure his appearance for trial.

#### 1. Goines Faces Life in Prison

The nature and circumstances of the offense is one of the factors the Court must consider in making its detention determination. *See* 18 U.S.C. § 3142(g)(1). The civil rights charges against Goines, charges which involve the use of firearms and resulted in deaths, carry significant penalties. Goines faces up to life in prison upon conviction, and at 55, even a conviction with a lesser sentence could result in him spending the rest of his life in prison.

In addition, if Goines is convicted of the 18 U.S.C. §242 counts, the sentencing guidelines would likely recommend a life sentence. For this offense, United States Sentencing Guidelines (USSG) §2H1.1(a)(1) directs the court to apply the offense level applicable to the underlying offense. In this case, the court would likely cross-reference the felony murder guidelines, pursuant to §2A1.2 (base level 38) since the felony occurred as soon as Goines sent officers into the house with dangerous weapons knowing there was not probable cause for the warrant, and the deaths occurred in the context of executing the search.

Pursuant to §2H1.1(b)(1)(B), the offense level is increased by six levels because the offense was committed under color of law, for a total offense level of 44. Pursuant to §3C1.1, the offense level should be increased by two levels because the defendant willfully obstructed justice, for a total offense level of 46. Even assuming the defendant is in Criminal History Category I of the Guidelines due to his lack of criminal convictions, the recommended Guideline range of imprisonment for the defendant would likely be life in prison. There is also no parole in the federal criminal justice system.

2. The Weight of the Evidence & History of Deceit Means Flight

As demonstrated above and at the detention hearing, the weight of the evidence against the defendant is strong and grows as the FBI continues its investigation into his apparent history of misconduct. Combine that with his history of deceit and lawlessness and the life sentence he faces, and there is a preponderance of evidence that the defendant will flee if not detained.

3. The Release Order's Restrictions Don't Prevent Flight

There is good reason to believe the defendant will flee if released. In response, the defendant has argued that his compliance in State court with his bond conditions lends support for the notion that he is not a flight risk. Harris County District Attorney's Office's case against the defendant is based on a complaint – he has not been indicted yet, and there is no certainty that he will be indicted, or if so, that he will be indicted on the same felony murder charge he is accused of in the complaint. If a Harris County grand jury does ultimately formally charge the defendant, he would likely be eligible for parole were he to be convicted of any such state charge.

Nothing in any release order could prevent the defendant from cutting off any GPS monitoring device he would wear and leaving in one of his late model vehicles to flee and to escape

the potential life sentence against him. His wife acting as a third party custodian and co-signer on an unsecured $150,000 bond is also not much of a deterrence from that flight. His wife cannot prevent him from leaving the house with whatever assets he may have, assets which might include the income he earned working for the Laniers - an income and job he and his wife failed to mention to Pretrial Services. Thus, the combination of the Release Order's conditions cannot reasonably assure the defendant's appearance at future court proceedings in this case.

**B. Goines is a Danger to the Community**

The nature and circumstances of the offense show the defendant has no regard for the safety and rights of the citizens he was sworn to protect, nor does he have any for his fellow officers. He did not hesitate to send his fellow officers into the residence at 7815 Harding Street knowing that no one had been to the house as claimed and that the officers were about to knock down a door and place themselves in a dangerous situation armed with a search warrant obtained by the defendant's lies. His actions caused real and permanent harms to his fellow officers, and resulted in the tragic deaths of two Houston residents and their dog. But beyond the events of January 28, 2019, the defendant has continued to be a danger to the community. He has used his position for sexual favors and taken advantage of his powers and discretion as a police officer to manipulate others, including judges, CIs and fellow HPD officers. As a CI handler, the defendant had tremendous discretion relating to their use and payment. He used that discretion to meet alone with CIs, which afforded him the opportunity to have no witnesses to what he might ask of a CI, to include maintaining a sexual relationship with one of them.

At the detention hearing, the defendant intimated that he might have been working with up to 22 CIs. None of the conditions in the Release Order would effectively prevent the defendant

from contacting any of the CIs he worked with, or any other HPD CI for that matter. The defendant could simply contact that particular CI with a phone he does not disclose to Pretrial Services. The only "check" on such behavior would be his wife, the same wife who corroborated that the defendant had no other sources of income or jobs since his HPD retirement. The same possibility holds true regarding the defendant contacting witnesses in violation of the Release Order.

In addition, the defendant has shown he has no respect for the law or the judiciary as a police officer and subject to all of HPD's rules and regulations - now that he has retired from HPD and their restrictions he is even more likely to violate the Release Order and be a danger to the community. Considering his history, and the defendant's characteristics, especially his penchant for lying, there is clear and convincing evidence that he will continue to flout court orders and rules to his advantage and attempt to coerce and manipulate the community, especially the community of CIs and law enforcement, unless he is detained pending trial.

Therefore, as United States Pretrial Services recommends, the United States requests that this Court revoke the Release Order and detain the defendant pending trial.


Respectfully submitted,

RYAN K. PATRICK
United States Attorney

By: *_/s/Alamdar S. Hamdani_*
ALAMDAR S. HAMDANI
Assistant United States Attorney
Texas Bar No. 24012771
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Phone: 713-567-9305
Fax: 713-718-3305

*_/s/Arthur R. Jones_*
Arthur R. Jones
Assistant United States Attorney
Southern District of Texas

*_/s/Sharad Khandelwal_*
Sharad Khandelwal
Assistant United States Attorney
Southern District of Texas

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

*_/s/Jared Fishman_*
Jared Fishman
Special Litigation Counsel
Civil Rights Division

## CERTIFICATE OF CONFERENCE

Counsel for defendant objects to the relief sought in this motion.

## CERTIFICATE OF SERVICE

This is to certify that on this 27th day of November, 2019, a true and correct copy of the foregoing was served electronically to counsel for the defendant.

*/s/ Alamdar S. Hamdani*
ALAMDAR S. HAMDANI
Assistant United States Attorney